IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| STEPHEN SEYMOUR, | ) | |
| | ) | |
| Plaintiff, | ) | NO. 3:16-cv-03039 |
| | ) | |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| LQ MANAGEMENT, LLC, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Pending before the Court is Defendants' Motion for Summary Judgment (Doc. No. 32). Plaintiff has filed a Response (Doc. No. 36), and Defendants have filed a Reply (Doc. No. 44).

### FACTS[1]

This slip and fall action arises from Plaintiff Seymour's rental of a hotel room in the La Quinta Inn and Suites in Franklin, Tennessee, on November 29, 2015. Plaintiff alleges that he fell in his hotel room (Room 103) as a result of a wet floor, causing bodily injuries. The Complaint sets forth state law claims for premises liability/negligence, vicarious liability, and negligent training and supervision. The parties dispute whether Defendants knew or should have known

---

[1] Plaintiff's Statement of Additional Material Facts (Doc. 38) does not specifically indicate the supposed relevance of these stated additional facts. In particular, Plaintiff does not indicate whether he contends that these stated additional facts help his cause because: (a) they are undisputed and help show that Defendants, based at least in part on these alleged undisputed facts, are not entitled to judgment as a matter of law; or (b) they are genuinely in dispute (and material), and thus preclude summary judgment. Local Rule 56.01(c) provides that the non-moving party may submit any additional facts as to which he asserts there is a genuine issue to be tried. There are two typographical errors within the Local Rule that obscure its purpose somewhat, but the intent is that the non-moving party, at its option, demonstrate any *disputed* issues of fact that it asserts preclude summary judgment.

about the existence of a dangerous condition in Plaintiff's hotel room and whether this incident caused Plaintiff to experience bodily injury.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 628. A party asserting that a fact cannot be or genuinely is disputed—i.e., a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in

the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A).

A party asserting that a fact cannot be or genuinely is disputed—i.e., a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). On a motion for summary judgment, a party may object that the supporting materials\ specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 2017 WL 57792 at ** 5 (6th Cir. Jan. 5, 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

**PREMISES LIABILITY/NEGLIGENCE**

In Count I, Plaintiff brings a claim styled as one for "Premises Liability/Negligence."

3

Where, as here, the basis for jurisdiction is diversity of citizenship of the parties, the Court applies the substantive law of the forum state. *Corley v. Wal-Mart Stores East, LP*, 637 Fed. App'x 210, 211 (6th Cir. 2016). In this case, that means Tennessee. Under Tennessee law, to establish a claim for negligence, Plaintiff must prove (1) a duty of care owed by Defendants to him; (2) conduct falling below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; and (4) causation. *Morris v. Wal-Mart Stores, Inc.*, 330 F.3d 854, 858 (6th Cir. 2003). Duty is the legal obligation one person owes to another to conform to the reasonable-person standard of care in order to protect against unreasonable risks of harm. *Miranda v. CSC Sugar, LLC*, No. W2017-01986-COA-R3-CV, 2018 WL 3302035 at * 3 (Tenn. Ct. App. July 5, 2018) (citing *Cullum v. McCool*, 432 S.W.3d 829, 833 (Tenn. 2013)).

The Court construes Plaintiff's claim as a particular kind of negligence claim—one founded on a premises liability theory. An owner's liability on a premises liability theory stems from his superior knowledge concerning the condition of the premises. *Jobe v. Goodwill Indus. of Middle Tenn., Inc.*, No. M2017-02299-COA-R3-CV, 2018 WL 2671613 at * 2 (Tenn. Ct. App. June 4, 2018); *Nee v. Big Creek Partners*, 106 S.W.3d 650, 653 (Tenn. App. 2002). The owner of the premises "has a duty to exercise reasonable care to prevent injury to persons lawfully on the premises." *Id.* (citing *Rice v. Sabir*, 979 S.W.2d 305, 308 (Tenn. 1998)).

Property owners are, therefore, required to exercise due care under all the circumstances. *Parker v. Holiday Hospitality Franchising, Inc.*, 446 S.W. 3d 341, 350 (Tenn. 2014). Property owners are expected to maintain the premises in a reasonably safe condition by removing or repairing dangerous conditions or by helping customers avoid injury by warning them of such dangerous conditions. *Wimmer v. Chattanooga-Hamilton Cty. Hosp. Authority*, __ S.W.3d __, 2018 WL 575521 at * 12 (Tenn. Ct. App. Jan. 26, 2018). This duty includes a duty to remove or

warn against latent or hidden dangerous conditions of which the owner is aware or should be aware through the exercise of reasonable diligence. *Miranda*, 2018 WL 3302035 at * 5.

On the other hand, business owners are not insurers of their patrons' safety. *Parker*, 446 S.W. 3d at 350. Thus, the property owner is not responsible for removing or warning against conditions from which no unreasonable risk was to be anticipated or from those which the occupier neither knew about nor could have discovered with reasonable care. *Id*. The mere existence of a defect or danger is generally insufficient to establish liability, unless it is shown to be of such a character or of such duration that a jury may reasonably conclude that due care would have discovered it. *Reynolds v. Rich*, 511 S.W.3d 526, 535 (Tenn. Ct. App. 2016).

"In order for an owner or operator of premises to be held liable for negligence in allowing a dangerous or defective condition to exist on its premises, the plaintiff must prove, *in addition to the elements of negligence*, that: 1) the condition was caused or created by the owner, operator, or his agent, or 2) if the condition was created by someone other than the owner, operator, or his agent, that the owner or operator had actual or constructive notice that the condition existed prior to the accident." *Blair v. West Town Mall,* 130 S.W.3d 761, 764 (Tenn.2004) (emphasis added).[2]

---

[2] The Court is somewhat puzzled by the description of these two alternative elements of a premises liability theory as being *in addition to* the standard elements of a negligence claim. If they truly set forth *required elements in addition to* those of a standard negligence claim, rather than an optional mode of satisfying certain of the elements of a standard negligence claim (such as the existence of a duty and/or breach of that duty), the question follows as to why anyone injured on someone else's premises would invoke the premises liability theory rather than pursue simply a standard negligence claim. Nevertheless, as articulated by the Tennessee Supreme Court, a premises liability claim has the four elements of a negligence claim, plus one of two alternatives for an additional element, and this appears to be the theory that Plaintiff has chosen and upon which the parties have joined battle on Defendants' Motion for Summary Judgment.

Defendants cite *Blair*, 130 S.W.3d at 764, for the proposition that the two alternative elements for a premises liability claim actually are alternative means of proving that the premises owner breached the duty of care to customers. (Doc. No. 33 at 7.) In other words, Defendants conceive of these alternative elements as being the way, in a particular kind of negligence case

In other words, to prevail in negligence against a property owner on a premises theory claim, the plaintiff must prove (in addition to the four elements of a negligence claim) that the condition was caused or created by the owner, operator or his agent or, if the condition was created by someone or something other than the owner, operator, or his agent, that the owner or operator had actual or constructive notice that the condition existed prior to the accident. *Parker*, 446 S.W. 3d at 350.

**SUMMARY OF DEFENDANTS' THEORY**

As indicated above, as described by the Tennessee Supreme Court, a premises liability claim has five elements, the first four being standard for a negligence claim and the fifth being one of two alternative elements that must be satisfied to make out a premises liability claim in particular. Defendants claim that Plaintiff fails to raise a material issue as to both the fourth element (causation) and the fifth element (in either of its two alternative versions), and that therefore it is entitled to judgment as a matter of law.

As set forth below, however, Plaintiff has raised a material issue of genuine fact as to both the fourth and the fifth element, and therefore survives Defendants' motion.

---

called a premises liability case, of satisfying both of the first two standard elements of a negligence claim. Although the Court understands why Defendants view it this way, Defendants' conclusion cannot be gleaned clearly from any part of *Blair* and is not consistent with the part of *Blair*—quoted above and in multiple Tennessee appellate decisions following *Blair*—stating that these two alternative elements are *in addition* to the elements of a negligence claim. Defendants should actually welcome the Court's interpretation, as it actually *increases* the Plaintiff's burden.

In any event, Defendants argue only that Plaintiff cannot satisfy either of these two alternative elements and do not otherwise challenge Plaintiff's ability to satisfy the applicable elements of the "Negligence/Premises Liability" claim he has pleaded, except for the fourth standard element of the negligence claim, *i.e.*, causation. The Court therefore will confine its analysis to these elements, and finds that Defendants have not prevailed with respect to any of them.

6

## ANALYSIS

I. A GENUINE ISSUE EXISTS AS TO THE FIFTH ELEMENT OF A PREMISES LIABILITY CLAIM.

Defendants begin by asserting that Plaintiff has identified no evidence of either of the two alternatives for the fifth element—i.e., 1) no evidence that the leak in Room 103 was caused or created by Defendants, or 2) assuming that the leak in Room 103 was not caused or created by Defendants, no evidence that Defendants had actual or constructive notice that the leak existed prior to Plaintiff's accident. However, in fact there is some, albeit not overwhelming, evidence to support each of these two alternatives.

As for the first alternative, evidence exists to support a finding that the leak in Room 103 was caused by Defendants.

The hotel's maintenance supervisor, Scott Christopher, testified at his deposition about a leak in the ceiling of Room 403 that he believed was caused by a leak in the roof above. Doc. No. 38-5 at 8 (Dep. at 32). The conditions in Room 403 are relevant because Room 103 was directly below Room 403, with Rooms 303 and 203 between them. *Id.* at 5 (Dep. at 18). Thus, it stands to reason that by force of gravity, water could make it from the leak in the roof above Room 403 all the way down to Room 103 if—and this is a big "if"—it were able to pass downward all the way through the ceilings and floors to Room 103. Although it is fair to say that the evidence of record does not establish that this is what occurred, it is not accurate to say that there is no evidence from which a rational trier of fact could conclude that this is what occurred. Instead, testimony of employees of Defendants indicates—albeit not especially strongly—that a leak from the roof all the way down to Room 103 could have occurred.

In discussing the situation in Room 403, Mr. Christopher testified that the ceiling in Room 403 fell in, *id.* at 11(Dep. at 42), and that he believed it did so because there was a leak in the roof

above the room. *Id.* (Dep. at 43). As for the time period of the leak to which he refers, Defendants' records indicate that Defendants were aware of the leak by November 18, 2015, shortly prior to Plaintiff's fall; from that date until April 16, 2016, Room 403 was on "Priority 4" status. *Id.* at 11, (Dep. at 42).[3] Moreover, Mr. Christopher indicated his belief that this roof leak may have been present by November 6, 2015. *Id.* at 8 (Dep. at 32). Likewise, Stan Carlock testified that he believed that when he arrived as the hotel's newly-hired general manager in August 2015, there had already been roof leaks, although it is unclear to the Court whether he was referring to a leak above Room 403 or somewhere else (such as a known leak above Room 429). Doc. 38-4 at 4 (Dep. at 13-15).

Mr. Christopher further testified that the leak came from a hole in the ceiling of Room 403 of an estimated size of 36 square inches, and that the hole in the ceiling of Room 403 remained for several months after November 18, 2015. Doc. No. 38-5 at 12 (Dep. at 46). Mr. Christopher also testified that once Room 403 went on Priority 4 status, every time it rained he inspected Room 403 to diagnose the source of the leak. *Id.* at 11 (Dep. at 44). This went on for approximately six months. *Id.* at 11-12 (Dep. at 44-45). Mr. Christopher also testified that it was fair to say that in early December 2015, there were leaks from the roof not only into Room 403, but also thereafter into Room 303 below that and in turn Room 203 below that. *Id.* at 13 (Dep. at 51-52). He testified that he had never seen water travel from the roof all the way down through Rooms 403, 303, 203 into 103, but he stated that it "could have." *Id.* at 20 (Dep. at 80).

Mr. Carlock testified about hotel officials' investigation regarding the source of the water leak into Room 103 that caused Plaintiff's fall. According to Mr. Carlock, they first thought the

---

[3] "Priority 4" referred to the most serious degree of maintenance problem, a problem so significant that the room had to be taken out of service, *i.e.*, it would not be rented to customers. Doc. No. 38-5 at 8 (Dep. at 32).

8

problem in Room 103 might have been a leak from the room above, either a toilet overflow or a tub leak, but after further investigation, "he – he determined that, you know, it was possibly a roof leak. He did go up and find some – some other rooms up above that had been affected by water." Doc. No. 38-4 at 3 (Dep. at 9-10).

The assistant manager at the time of this incident, Vladimir Lewis, testified that he had never seen water leak all the way down from the roof to the first floor. Doc. No. 38-3 at 7 (Dep. at 27). He did state, however, after reviewing the maintenance records, that the roof leaked from Room 403 to Room 303 to Room 203, right above Room 103. *Id*. (Dep. at 28).

In short, the testimony of these three hotel employees indicates that beginning not later than November 18, 2015, and perhaps months earlier, and recurring continually until the time of Plaintiff's fall (and long thereafter), there was an ongoing leak into Room 403 from a hole in the roof above it. Their testimony further indicates that the leaking water did make it from the roof all the way to Room 203 and *could* have possibly made it down to Room 103 and thus could be the explanation for the water in Room 103[4]. Thus, the Court has little trouble concluding that there is a genuine issue as to whether the presence of the water in Room 103 was caused by the hole in the roof above Room 403. Defendants dispute this, but they have not offered an alternative source or reason for the presence of the water, which only serves to highlight the fact that a jury could reasonably attribute it to the leak in the roof.

---

[4] Moreover, a jury is allowed to make determinations based on common sense, common experience, the jury's own perceptions, or simple logic—at least where the issue is amenable to determinations based on these things without the need to resort to expert opinion. *Jones v. Pramstaller*, 813 F. Supp. 2d 713, 720 (W.D. Mich.2012) (quoting Charles Alan Wright et al., 29 *Federal Practice & Procedure Evidence* § 6264). Defendant has not explained why a jury could not, on these bases, determine by a preponderance of the evidence that water found in Room 103 was from the same source as water that undisputedly had traveled multiple stories down into Room 203 just above Room 103.

That is not necessarily to say, however, that the presence of water at the time of Plaintiff's fall was caused by *Defendants*. Even if the water's presence was caused by a hole in the roof, that would mean the water's presence was caused by Defendants only to the extent Defendants caused—were responsible for—the hole in the roof as of that time. Since Defendants' employees were aware of the hole in the roof by November 18, 2015, at the very latest, the Court believes that a jury *could* properly find Defendants responsible for "causing" the presence of the hole on November 29 by failing to repair the hole in the (at least) eleven-day window proceeding November 29.[5]

Defendants have not explained why a jury could not validly make such a finding. Instead, Defendants argue that Mr. Christopher attempted to repair the roof on a number of occasions, implying that this somehow absolves them from responsibility for the hole in the roof. In making this argument, however, Defendants rely exclusively on particular testimony of Mr. Christopher (Doc. No. 38-5 at 6 (Dep. at 24)), which indicates that his attempts all occurred by 2016 at the latest but in no way indicates that any attempt was made prior to November 29, 2015. To the contrary, Mr. Christopher testified elsewhere that he had never attempted to repair the roof prior to that date. Doc. No. 38-5 at 6 (Dep. at 24). Moreover, Mr. Christopher was unable to testify that he had even done so much as to merely request repairing of the roof prior to November 29. *Id.* at 7 (Dep. at 27). Accordingly, a jury could validly fault Defendants for not demonstrably attempting to repair the roof in the relevant eleven-day (or more) window prior to November 29, 2015. And even if efforts to repair the roof had been made by November 29, 2015, a jury could validly find

---

[5] This is true even if Defendants could not properly be deemed to have caused the hole to appear in the first place.

that by *failing* in their efforts to repair the roof prior to that date, Defendants are responsible for—i.e., should be deemed to have caused—the ongoing presence of the hole in the roof as of that date.

This notion—that the jury could find Defendants responsible for causing the hole in the roof as of November 29 through what the jury views as either their inaction or failed action—is supported by an important axiom: negligence is ordinarily an issue to be decided by a jury, and can be withdrawn from the jury only in those cases where the facts are established by evidence free from conflict and the inference from the facts is so certain that all reasonable minds must agree. *Surles v. Greyhound Lines, Inc.*, 474 F.3d 288, 304 (6th Cir. 2007); *Tanner v. Ogden*, 2014 WL 1413495 at * 2 (M.D. Tenn. Apr. 11, 2014).

In summary, there is a genuine issue of material fact as to whether the roof leak caused the water on the floor of Room 103 and as to whether Defendants caused the roof leak to exist as of the time of Plaintiff's fall. Because Plaintiff has raised a genuine issue as to one of the two alternatives for satisfying the fifth element, Plaintiff survives summary judgment even if it cannot raise a genuine issue as to the second alternative.

Nevertheless, the Court will address the second alternative, and finds that Plaintiff has raised a genuine issue as to the second alternative as well, because even if Defendants did not cause the leak in Room 103, Plaintiff has raised a genuine issue as to whether Defendants had constructive notice of the leak in Room 103 prior to Plaintiff's accident.

Defendants assert that there is no evidence that any of Defendants' employees had actual knowledge that there was water in Plaintiff's hotel room prior to his fall. As to constructive knowledge, Defendants maintain there is no evidence that water was present in Room 103 for any particular length of time or that leaking water in Room 103 was a common or regular occurrence. Plaintiff argues, however, that Defendants had actual notice of a defective roof that Defendants

knew had, for a period of time, caused leaks into Room 403 and rooms below, including Room 203 just above Plaintiff's Room 103. Therefore, Plaintiff claims, Defendants had constructive notice that a dangerous condition existed in Room 103. Plaintiffs assert that the regularity of roof leaks at the hotel, particularly over Room 403, put Defendants on reasonable notice that a foreseeable and dangerous condition existed in Room 103, of which Defendants should have been aware through the exercise of reasonable diligence.

The Court agrees with Defendants on the issue of actual notice. There is no evidence that any of their agents or employees knew of any dangerous condition in Room 103 prior to Plaintiff's fall. Moreover, even if Defendants had actual notice of water periodically leaking into the rooms above Room 103, that is not the same thing as—and thus not sufficient to show—*actual* knowledge as to the alleged dangerous condition here at issue, i.e., water on the floor in Room 103 at the time of Plaintiff's fall.

Constructive notice, however, is another matter entirely. Constructive notice is defined as "information or knowledge of a fact imputed by law to a person (although he may not actually have it) because he could have discovered the fact by proper diligence, and his situation was such as to cast upon him the duty of inquiring into it." *Jobe*, 2018 WL 2671613 at * 3. Constructive notice may be established by showing that a dangerous or defective condition existed for such a length of time that a property owner, in the exercise of reasonable care, should have become aware of it. *Id.*; *Parker*, 446 S.W.3d at 351. Constructive notice may also be established by showing that the dangerous condition resulted from "a pattern of conduct, a recurring incident, or a general or continuing condition" indicating the dangerous condition's existence. *Id.*; *Blair v. West Town Mall*, 130 S.W.3d 761, 765-66 (Tenn. 2004).

Under these principles, there is a genuine issue as to whether, based on their knowledge of what was happening directly above Room 103, Defendants had constructive knowledge of the allegedly dangerous condition (*i.e.*, water on the floor) in Room 103 at the time of Plaintiff's fall. The Court at this juncture cannot say as a matter of law that Defendants, in the exercise of reasonable care, should not have been aware that there was water on the floor. For example, a jury could reasonably conclude that, given the repeated leaking issues above Room 103, Defendants in the exercise of reasonable care should have become aware of the leaking into Room 103 by inspecting Room 103 for leaks prior to renting it to Plaintiff. [6] Likewise, a jury could reasonably find that water in Room 103 resulted from a recurring or continuing condition—the leaking roof—and that the leaking roof (and the resulting leaks all the way down to Room 203 directly above Room 103) indicated the presence of water in Room 103.[7] Such findings are far from mandatory, given the state of the evidence. But they would not be unreasonable. This conclusion is buttressed, again, by the axiom that negligence is generally an issue to be decided by a jury, to be withdrawn

---

[6] As to the specific issue of whether Defendants exercised reasonable care, there certainly exists a genuine issue of material fact. The character and duration of the roof leak could lead a trier of fact reasonably to find that Defendants breached the standard of due care by turning Room 103 over to Plaintiff without inspecting it for the presence of water. A jury reasonably could find that the water on the floor of Room 103 came from the roof leak (as discussed above), and a jury further could find that a prudent hotel operator, under these circumstances, would be constantly vigilant for the presence of water in Room 103. On the other hand, a reasonable jury could decline to make these findings in favor of Plaintiff. The Court cannot say as a matter of law, on this motion for summary judgment, that Defendants did or did not exercise reasonable care.

[7] Defendants essentially argue, not incorrectly, that notice of a general or continuing condition in one area of the premises does not necessarily support a finding of constructive notice of a dangerous condition in another area. They note that one factor in the constructive notice inquiry is "the proximity between where the dangerous condition occurred previously and where the plaintiff suffered his or her injury." (Doc. No. 33 at 10) (quoting *Katz v. Sports Authority of Metropolitan Government of Nashville*, No. M2016-01874-COA-R3-CV, 2017 Westlaw 3741346, *4 (Tenn. Ct. App. Apr. 12, 2017)). But this factor does not cut in Defendants' favor, given the spatial proximity (and very relevant spatial alignment) between Room 203 (into which, according to the evidence, water from the leaking room penetrated) and Room 103.

from the jury only where the facts are established evidence free from conflict, and the proper inference to be drawn from the facts cannot reasonably be disputed.

II.     A GENUINE ISSUE EXISTS AS TO THE FOURTH ELEMENT OF A PREMISES LIABILITY CLAIM.

Defendants also contend that Plaintiff has not carried his burden to show that his alleged injuries were caused by this incident. Causation is a jury question unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome. *Bishop v. Hamya, Inc.*, Case No. 16-CV-01123, 2018 WL 3959526 at * 7 (M.D. Tenn. Aug. 17, 2018).

Plaintiff first saw a chiropractor, Dr. Wetherington, following this incident. Dr. Wetherington testified that he had not seen any of Plaintiff's VA medical records before he treated Plaintiff. Doc. No. 34-9 at 5 (Dep. at 35). Dr. Wetherington testified that Plaintiff's past history did not contribute to his decision-making as to treatment, but that does not mean that Plaintiff's past history was noncontributory to his pain. *Id*. at 8-9 (Dep. at 46-47). In addition, he testified that Plaintiff had an acute injury, meaning a recent onset injury, which he attributed to the alleged slip and fall. *Id*. at 10 (Dep. at 48). He could not, however, give any definitive percentage of the pain that would have been consistent with the acute injury versus things that might have preexisted. *Id.* at 11 (Dep. at 50). He acknowledged that Plaintiff's fall exacerbated a preexisting condition, but he could not quantify the percentage of Plaintiff's condition that was exacerbated as opposed to what was preexisting. *Id*. at 15 (Dep. at 72). He testified that Plaintiff's being overweight could cause or contribute to back pain, but there is no way objectively to quantify what portion of back pain is caused by being overweight. *Id*. at 6-7 (Dep. at 41-42).

Plaintiff was later referred to an orthopedic surgeon, Dr. Freudenberger, who performed spinal surgery on Plaintiff in June of 2016. Dr. Freudenberger testified that he did not remember

14

seeing any of Plaintiff's prior medical records. Doc. No. 34-10 at 6-7 (Dep. at 28-29). He stated that, assuming Plaintiff had decades of preexisting back conditions, he could not rule out that the fall could have contributed to his injury, but whether or not it was the causal reason, he was not sure. *Id.* at 8 (Dep. at 39).

Defendants' expert witness, Dr. Spengler, reviewed all of Plaintiff's medical records and opined that Plaintiff's slip and fall in his hotel room had no relationship to the degenerative changes that were noted in his lumbar spine that ultimately resulted in a spinal surgical procedure on June 21, 2016. Doc. No. 34-11 at 4. "Mr. Seymour had reported back pain on many occasions prior to his fall in November of 2015. His excessive weight and prior complaints of back pain including the use of narcotics does not support a new musculoskeletal problem secondary to his slip and fall." *Id*.

The Court finds that, on the current record, the cause of Plaintiff's injuries is inconclusive. What portion of Plaintiff's pain and/or injury, if any, was caused by the fall and what portion was caused by his prior exiting conditions is not clear and is subject to genuine dispute, precluding summary judgment on this issue. This is simply not a case in which reasonable minds could draw but one conclusion as to causation.

## CONCLUSION

As set forth above, there are genuine issues of material fact as to whether Defendants caused the alleged dangerous condition in Room 103. There are also genuine issues of material fact as to whether Defendants had constructive notice of a dangerous condition in Room 103, based upon their knowledge of the leaking roof and the fact that water had leaked all the way down at least to Room 203. Finally, there are genuine issues of material fact as to whether the fall in Room 103 caused Plaintiff's injuries. In arguing otherwise, Defendants have made numerous arguments

15

that could be appropriately made before the jury at trial, but which are to no avail at the summary judgment stage. For all these reasons, Defendants' Motion for Summary Judgment on Plaintiff's premises liability/negligence claim will be denied.

Defendants base their motion as to Plaintiff's claims for vicarious liability and negligent supervision and training on their alleged entitlement to summary judgment on the premises liability/negligence claim. Accordingly, that portion of their motion will be denied as well.

An appropriate Order will be entered.

*Eli Richardson*<br>
ELI RICHARDSON<br>
UNITED STATES DISTRICT JUDGE